2SUSAN M. CHEHARDY, Judge.
In this wrongful death action, after trial, the jury found that Illinois Central Railroad Company was negligent but that its negligence was not a cause of plaintiffs death. Tommy McCarra, the decedent’s widow, appeals. For the following reasons, we affirm the decision of the trial court.

FACTS

In October of 1959, James McCarra began working for defendant, Illinois Central Railroad Company (“Illinois Central”), as a clerk. Over the next 33 years, he worked his way up to a management position with Illinois Central. In 1985, Mr. McCarra was transferred to Illinois Central’s Mayes Yard in Harahan, Louisiana, where he worked as an assistant Trainmaster and, later, a roving Yardmaster. According to Mr. McCarra’s supervisor, both of those jobs entailed mostly administrative work performed in the Trainmaster’s Office at the Mayes Yard.
In the fall of 1992, Anheuser-Busch, a customer of Illinois Central’s with a distribution facility adjacent to the Mayes Yard, experienced a strike by its employees. Illinois Central’s regular yard crews, made up of union employees, honored the An-heuser-Busch employees’ strike and refused to cross the picket line at Anheuser-Busch. In order to fulfill its commitment to its | .customer, Illinois Central sent its management employees to perform the necessary work at the Anheuser-Busch facility.
On September 9, 1992, James McCarra reported to work at Illinois Central’s Mayes Yard at about 4:00 p.m. That afternoon, Mr. McCarra and his supervisor, Carl Sheridan, the trainmaster for Illinois Central’s Mayes Yard, performed the work for Anheuser-Busch that was usually done by a yard crew. Mr. Sheridan drove the locomotive attached to the boxcars to be delivered to Anheuser-Busch while Mr. McCarra did the necessary groundwork to allow the train to proceed from the Mayes Yard to the Anheuser-Busch facility. The groundwork involved disembarking from the train, lining switches,[1] and uncoupling[2] the railcars from the locomotive.
*256 According to Sheridan, Mr. McCarra had to line three switches on the railroad tracks within the Mayes Yard to allow to train to move onto the main track, which leads to Anheuser-Busch. Mr. McCarra then lined the switch allowing the train to enter the Anheuser-Busch facility, and, after the train was properly positioned, Mr. McCarra uncoupled the locomotive from the railcars. Sheridan then coupled the locomotive with empty railcars that needed to be removed from Anheuser-Busch and Mr. McCarra threw the switch to allow the train back out onto the main railroad track.
After traveling about one-half mile back towards the Mayes Yard, Mr. McCarra disembarked near the Hickory Street overpass to throw the switch necessary to allow the train back into the yard. When Sheridan, who was driving the train, approached that switch, he noticed that it had not been lined. After attempting to contact Mr. McCarra, Sheridan stopped the train, disembarked and lined the switch. When Sheridan turned around, he saw Mr. McCarra lying on |4the ground near the track. The emergency room physician at Elmwood Hospital determined that Mr. McCarra had suffered a heart attack. Mr. McCarra died later that evening.

PROCEDURAL HISTORY

On September 7, 1995, Tommy McCar-ra, the decedent’s widow, filed the instant lawsuit against Illinois Central Railroad company under the Federal Employers Liability Act (“FELA”),[3] alleging that James McCarra’s heart attack was caused by the railroad’s negligence in “misassigning” him to do manual labor in the switching yard on September 9, 1992 and failure to properly maintain its equipment and switches.
The matter proceeded to trial on September 5, 2000. On September 7, 2000, after the plaintiff rested, and outside of the presence of the jury, Illinois Central moved for a directed verdict, which the trial judge verbally granted with respect to the plaintiffs claims of defective equipment and improper maintenance and denied with respect to all other issues.
At the conclusion of its deliberations, the jury answered the jury interrogatories as follows:
1. Do you find, by a preponderance of the evidence, that Illinois Central was negligent with regard to Mr. McCarra’s work activities on September 9,1992?
xx yes _no
If you answered yes to the first question, please proceed. If you answered no, please stop answering questions and return the verdict form to the appropriate court personnel.
2. Do you find that Illinois Central’s negligence caused Mr. McCarra’s heart attack on September 9, 1992?
15_yes xx no
*257 If you answered yes to the above question, please proceed. If you answered no, please stop answering questions and return the verdict form to the appropriate court personnel.
While the jury found Illinois Central negligent with regard to Mr. McCarra’s work activities that afternoon, the jury did not find that the defendant’s negligence was a cause of Mr. McCarra’s heart attack. Because the jury did not find that defendant’s negligence caused Mr. McCarra’s death, it awarded no damages to the plaintiff.
On September 13, 2000, the plaintiff filed a Motion for Judgment Notwithstanding the Verdict or, alternatively, a Motion for New Trial, which were denied on October 6, 2000. On October 11, 2000, the trial judge entered judgment in favor of Illinois Central and dismissed the plaintiffs claims with prejudice. On October 17, 2000, counsel for plaintiff filed a petition for devolutive appeal.
In her appellate brief, plaintiff asserts three assignments of error: the trial court committed legal error by placing an excessively high burden of proof of FELA causation on the plaintiff in the Jury Interrogatories; the jury was manifestly wrong and committed clear error in failing to find that the railroad’s negligence was at least a slight cause of James McCarra’s death; and the trial court erred in failing to grant a Judgment Notwithstanding the Verdict or, alternatively, a new trial. Plaintiff concedes that the central issue presented is whether the jury was clearly wrong in failing to find that the railroad’s negligence was a cause, even a slight cause, of James McCarra’s death.

ANALYSIS

In her first assignment of error, plaintiff contends that the wording of the jury interrogatory on causation [4] placed an “undue burden on the plaintiff.” She argues that the jury interrogatory | fifailed to properly advise the jury that it could find causation if there was even slight evidence that Illinois Central’s negligence led to Mr. McCarra’s heart attack.
The trial judge has a duty to give instructions to the jury which properly reflect the applicable law in light of the pleadings and facts in each particular case. Crooks v. National Union Fire Ins. Co., 620 So.2d 421, 424 (La.App. 3 Cir.1993), writ denied, 629 So.2d 391, 392 (La.1993). The Crooks court further stated:
Proper jury instructions are those which fairly and reasonably point up the issues presented by the pleadings and evidence and provide correct principles of law for the jury to apply to those issues. It is also the judge’s responsibility to reduce the possibility of confusing the jury.
Further, a special verdict requiring a jury to return a special written finding on each issue of fact requires adequate jury interrogatories which fairly and reasonably point out the issues and which guide the jury in reaching a verdict. If the trial court submits a verdict form to the jury with misleading or confusing interrogatories, just as when it omits to instruct the jury on an applicable essential legal principle, such interrogatories do not adequately set forth the issues to be decided by the jury and may constitute reversible error.
If error misled the jury, then this court must set aside the verdict and, if the record permits — if it is complete— then this court must make its own find *258 ings of fact, and render a verdict. If, however, there is no error, or if the error did not induce the jury to reach an erroneous verdict, then the jury’s findings and verdict are entitled to deference, and the standard of review is whether those findings were manifestly erroneous — not supported by the record.
Crooks, supra at 424-425. (Citations omitted).
We have reviewed the trial judge’s instructions thoroughly and find that they were adequate. The trial judge clearly set forth the relevant principles of tort law, specifically, liability under the theory of negligence, in her jury charges. The trial judge also properly instructed the jury that the plaintiff had to prove that Illinois Central’s negligence was a cause, however slight, of her husband’s heart attack.
The plaintiff contends that the error lies in the second interrogatory set out in the verdict form. At trial, counsel for the plaintiff objected to the wording, arguing that it placed too much emphasis on the necessity to find negligence and did not specify that the railroad was liable for damages, even if its negligence was a slight cause of Mr. McCarra’s heart attack. We disagree 17with the plaintiffs argument that the wording discredited their assertion that the defendant’s negligence caused Mr. McCarra’s heart attack. The jury interrogatory-properly queried whether Illinois Central’s negligence was a cause of Mr. McCarra’s heart attack. We find, therefore, that the verdict form did not contain an error that may have misled the jury. Accordingly, we find that the plaintiffs first assignment of error lacks merit.
In her second assignment of error, the plaintiff argues that the jury was clearly wrong in failing to find that the railroad’s negligence was a cause, even a slight cause, of James McCarra’s death. She contends that the jurors were confused on the issue of causation because two of the jurors voted that the railroad was not negligent but that the railroad was the cause of Mr. McCarra’s heart attack.
Initially, after reviewing the trial transcript, we note that plaintiffs statement is inaccurate. The transcript of the jury polling reveals, to the contrary, that the two jurors in question both voted that the railroad was not negligent and that the railroad’s actions were not a cause of Mr. McCarra’s heart attack.
Plaintiff further argues that the jury was clearly wrong in finding that the railroad’s negligence was not the slightest cause of Mr. McCarra’s heart attack because the evidence presented at trial indicated that Mr. McCarra’s risk of heart attack was increased by the physical exertion of the manual labor he was required to perform on September 9, 1992. She also argues that the railroad’s failure to conduct a routine physical examination on Mr. McCarra before requiring him to do manual labor was also a cause of his heart attack.
Federal Employer’s Liability Act (FELA), 45 U.S.C. § 51, was designed to provide a remedy to railroad employees for injuries and death resulting from the negligence of their employers or fellow employees. Atchison, T. & S.F.R. Co. v. Buell, 480 U.S. 557, 561-562, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987).[5] In order for a plaintiff to recover under FELA, he *259 must |sestablish that (1) he was injured within the scope of his employment; (2) the employment was in furtherance of the railroad’s commerce in interstate transportation; (3) his employer was negligent; and (4) this negligence played “any part, however small,” in causing the injury or death. Sinkler v. Missouri Pacific Railroad Co., 356 U.S. 326, 330, 78 S.Ct. 758, 2 L.Ed.2d 799 (1958); Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 508, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957).
A railroad has a duty to assign employees to work for which they are reasonably suited and breaches that duty if it negligently assigns an employee to perform work beyond his capacity. Bascho v. Pennsylvania R. R., 3 N.J.Super. 86, 65 A.2d 613, 616 (1949). The railroad is negligent if it knew or should have known that its assignment exposed the employee to an unreasonable risk of harm. Dunn v. Conemaugh & Black Lick R. R., 267 F.2d 571, 576 (3rd Cir.1959). Generally, a railroad has no duty to ascertain whether an employee is physically fit for his job, but if it undertakes to give physical examinations, it is liable if it performs those examinations negligently. Isgett v. Seaboard Coast Line R. R., 332 F.Supp. 1127, 1141 (D.S.C.1971).
Determining liability under FELA is a distinctly federal question. Urie v. Thompson, 337 U.S. 163, 174, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). Negligence is a federal question, which is not substantially different than a state’s legal definition of negligence. Urie, supra. Causation is a jury issue whenever there is evidence that an employer’s negligence caused the harm, or, more precisely, enough to justify a jury’s determination that employer negligence had played any role in producing the harm. Armstrong v. Kansas City Southern Railway Co., 752 F.2d 1110 (5th Cir.1985).
Where there is an evidentiary basis for the jury’s verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916 (1946). An appellate court may not reverse findings of fact in a FELA case unless there is a complete absence of any probative facts to support the fact finder’s 1 flconclusions. Dennis v. Denver & Rio Grande Western Railroad Co., 375 U.S. 208, 210, 84 S.Ct. 291, 11 L.Ed.2d 256 (1963) (citing Lavender v. Kurn, supra).
Mrs. McCarra testified that her husband had been employed with Illinois Central Railroad for over 33 years, and he had been working at the Mayes Yard in Hara-han, Louisiana for at least seven years prior to his injury. She testified that he was an assistant yardmaster, or what he called a “rover,” which involved primarily office work. On cross examination, she stated that she did not know whether his job entailed some work outdoors in the railroad yard.
During his tenure with Illinois Central, she knew that he had performed ground crew work about four or five times previously, usually during strikes. She recalled that, a few weeks before his death, he told her that he had done ground crew work during the same Anheuser-Busch strike. She also admitted that, when he performed the ground work previously, he did not complain that it was too strenuous.
She stated that the railroad did not provide him with an annual physical. But she also admitted that her husband did not have annual checkups or physical examinations by a physician, other than his dermatologist. She recounted that, about two weeks before his death, she measured her husband’s blood pressure, which was elevated. Further, since his death, the decedent’s sister and two of his brothers have *260 experienced heart problems. At his death, Mr. McCarra, who was about 5'9" tall, weighed between 225 and 250 pounds.
Carl Sheridan, the trainmaster of the Mayes Yard, testified that Mr. McCarra was classified as a roving yardmaster for the Mayes Yard. Mr. Sheridan stated that as a roving yardmaster, Mr. McCarra would not only perform administrative duties, but also went to the outlying areas that were part of the Mayes Yard to take care of other jobs. Sheridan stated that Mr. McCarra did not stay primarily in the yardmaster’s tower.
Mr. Sheridan testified that the yard jobs at Mayes were usually performed by a three-man crew pursuant to the union contract, but on September 9, 1992, he and Mr. McCarra performed the work. Sheridan recalled that he and Mr. McCarra had performed the ground crew work 11f)together on two previous occasions during the Anheuser-Busch strike. He stated that the railroad switches weighed twenty pounds each and Mr. McCarra had to throw three switches to get to Anheuser-Busch. Sheridan also stated that Mr. McCarra uncoupled the railcars from the locomotive, which required him to lift and pivot a five-pound iron pin to release the connection. Sheridan testified that throwing switches and uncoupling cars were one-man jobs. He stated that he did not see Mr. McCarra lift or carry anything over 20 pounds that evening. Sheridan recalled that Mr. McCarra, who rarely complained, told him that he’d eaten a big bowl of chili for lunch and that he had the worst indigestion of his life that day. •
Mr. Sheridan indicated that a trainman is given a preemployment physical, which is repeated every four years. He also testified that the railroad would pay for an annual physical for trainmasters. John King, a yardmaster for Illinois Central, testified that the railroad would pay for an annual physical for its yardmasters but yardmasters, unlike trainmasters, were not required to take a physical.
Illinois Central presented testimony from Carla D. Syler, a vocational rehabilitation counselor, regarding the level of physical exertion required by the work Mr. McCarra was performing on September 9, 1992. Her assessment of the job was that the heaviest work he performed was lifting up to 20 pounds occasionally, which falls in the category of light work.
Both parties presented expert medical testimony from cardiologists. Dr. Carl Lavie, who was called by the plaintiff, examined Mr. McCarra’s emergency room records, which indicated that Mr. McCarra had a myocardial infarction with extensive electrocardiographic changes. In other words, Mr. McCarra had a very large heart attack indicating blockages in more than one of the three heart arteries.
He testified that research indicates when a sedentary individual participates in strenuous exercise, which is defined as something over six METS, the individual’s risk of heart attack is increased 107 times within an hour of the exertion. He testified that the yard crew work, as described in depositions he reviewed, required work equivalent to seven METS while sedentary |1T office work requires three or four METS.[6] However, he admitted that he made that determination because one of the depositions he read stated that yard work entailed lifting between 50 to 100 pounds.
*261 He testified that overweight individuals with a history of hypertension are at a higher risk for heart attacks. Further, he testified that it was likely that a thorough physical examination would have revealed Mr. McCarra’s coronary artery disease. Finally, he testified that the statistics suggested an 80% probability that the physical exertion of the ground crew work triggered Mr. McCarra’s heart attack.
Dr. Lavie admitted that he never examined Mr. McCarra nor had he personally observed the type of ground work Mr. McCarra was performing that day. He also admitted that there has not been research that studied the correlation between physical activity of less than six METS and the onset of a heart attack. He further admitted that a heart attack is caused as the result of a blockage that forms when a cholesterol plaque on the lining of the artery becomes unstable and ruptures. These blockages usually develop over an extended period of time and Mr. McCarra’s coronary artery disease began long before he went to work on September 9,1992.
Dr. James Davia, who was called by the defense, testified that he also reviewed the emergency room records for Mr. McCarra from September 9, 1992. He testified that Mr. McCarra had coronary artery disease, which is evidenced by a buildup of cholesterol plaques over many years. He also testified that one of the depositions he read indicated that Mr. McCarra complained of the onset of back pain the night before his death, which may have indicated that an arterial blockage was forming. Dr. Davia also testified that, according to the depositions he reviewed, Mr. McCarra was rubbing his left arm and complaining of severe indigestion before he began work that evening, which are both warning signs of an impending heart attack.
haDr. Davia also indicated that a trigger, like physical exertion, is different from the cause of a heart attack, which is coronary artery disease. Dr. Davia testified that there is also research that indicates that a sedentary individual has only a seven-fold increase in the risk of heart attack for the hour after physical exertion of six METS. He also testified that the information that he reviewed did not indicate that the ground crew work that Mr. McCarra was performing the day of Ms death was equal to six METS of work. Dr. Davis quoted from research which identified the following activities as equivalent to six METS of work: cross country skiing, ice hockey, fast bicycling, shoveling snow, playing tennis, and lifting 45 to 50 pounds. Finally, citing the same research study quoted by the plaintiffs cardiologist, Dr. Davia noted that, in the end, the study found that “heavy exertion may be considered to be the final component cause in 3.8 percent of [heart attack] cases.”
After hearing this testimony, the jury found that Illinois Central was negligent with regard to Mr. McCarra’s work activities that day but its negligence was not a cause of his heart attack. Where there is an evidentiary basis for the jury’s verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. Lavender v. Kurn, supra, at 653, 66 S.Ct. 740. After a thorough review of the entire record, we find that there was sufficient evidentiary basis for the jury’s verdict that Illinois Central was negligent with regard to Mr. McCarra’s work activities for September 9, 1992.
With regard to causation, we, likewise, find ample support for the jury’s finding that Illinois Central’s negligence was not a cause of Mr. McCarra’s heart attack. An appellate court may not reverse findings of fact in a FELA case unless there is a complete absence of any *262 probative facts to support the fact finder’s conclusions. Dennis v. Denver & Rio Grande Western Railroad Co., supra, at 210, 84 S.Ct. 291 (citing Lavender v. Kurn, supra). We find that the record contains ample probative facts to support the fact finder’s conclusions. Accordingly, we find plaintiff’s second assignment of error is without merit.
| ^Finally, in her last assignment of error, the plaintiff argues that the trial judge erred in not granting her Motion for Judgment Notwithstanding the Verdict or, alternatively, her Motion for New Trial.
JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991).
Refusal to render a judgment notwithstanding the verdict (JNOV) can only be overturned if it is manifestly erroneous. Delaney v. Whitney National Bank, 96-2144, 97-0254 (La.App. 4 Cir. 11/12/97), 703 So.2d 709, writ denied, 98-0123 (La.3/20/98), 715 So.2d 1211. Furthermore, a jury’s finding of fact may not be reversed absent manifest error or unless clearly wrong. Stobart v. State of Louisiana, Through Department of Transportation and Development, 92-1328 (La.4/12/93), 617 So.2d 880. The reviewing court must do more than just simply review the record for some evidence which supports or controverts the trial court’s findings; it must instead review the record in its entirety to determine whether the trial court’s finding was clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882.
The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Stobart, supra. The reviewing court must always keep in mind that “if the trial court or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Stobart at 882-83. (Citations omitted).
|uIn this case, we have already concluded that the jury’s finding was not clearly wrong. Although we understand that the plaintiff suffered a great loss, we cannot say, viewing the record in its entirety, that the jury’s conclusion was unreasonable. Therefore, we cannot say that the trial court’s refusal to grant the plaintiffs motion for judgment notwithstanding the verdict was manifestly erroneous.
Finally, granting or denying a motion for new trial rests within the wide discretion of the trial court and its determination shall not be disturbed absent an abuse of that discretion. Lambert v. State Through Dept. of Transp. & Development, 96-160 (La.App. 5 Cir. 10/16/96), 683 So.2d 839, 845. We find no abuse in the trial court’s denial of plaintiffs motion for new trial.
Accordingly, we find that plaintiffs third assignment of error also lacks merit.
In conclusion, we affirm the jury verdict and the trial court’s denials of the Judg *263 ment Notwithstanding the Verdict and, alternatively, Motion for New Trial. The parties are to pay their own costs for this appeal.

AFFIRMED.

. According to Carl Sheridan, a railroad "switch” is a two-foot metal lever, weighing about 20 pounds, attached to a metal pole that controls the position of a railroad track. The terms "lining” or "throwing” mean to pivot the metal lever from one side to the opposite side in order to switch the railroad track to the correct position for the train to enter or exit a given track.

. Uncoupling railcars involves lifting and pivoting a five-pound lever that is attached to the *256 railcar, to allow the locking device inside the coupling mechanism to open, which allows the locomotive to disconnect from the railcar.

. At trial, the parties stipulated that "Illinois Central Company operated a railway company in interstate company and James McCarra was an employee of Illinois Central Railroad Company in such interstate commerce at all times relevant herein.” The Federal Employers' Liability Act, 45 U.S.C. § 51, states, in pertinent part:
Every common carrier by railroad while engaging in commerce ... shall be liable in damages to any person suffering injury while he is employed by such carrier ..., or, in case of the death of such employee, to his personal representative ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier.

. The interrogatory in question read, "Do you find that Illinois Central's negligence was a cause of Mr. McCarra's heart attack on September 9, 1992?”

. While FELA is not a worker’s compensation statute, it preempts state law and is the exclusive remedy for injured railroad employees. Ellis v. Union P.R. Co., 329 U.S. 649, 653, 67 S.Ct. 598, 91 L.Ed. 572 (1947). Although state courts have concurrent jurisdiction, pursuant to 45 U.S.C. § 56, federal substantive law must be applied. Monessen Southwestern Railway Co. v. Morgan, 486 U.S. 330, 335, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988).

. A MET was defined by Dr. Lavie as "a way to try to quantify how much work a person is performing at any particular time. One MET is equal to the amount of oxygen the body is utilizing.”